MATTER OF A—

In DEPORTATION Proceedings

A–4872170

*Decided by Board March 31, 1961*

Suspension of deportation—Timely application—Fee requirement cannot be
waived.

(1) An unsigned copy of an application for suspension of deportation under
section 244(a)(1) of the 1952 Act, unaccompanied by a fee, handed to a
Service investigating officer prior to the statutory cut-off date of December
23, 1957, cannot be regarded as a timely application.
(2) The fee for filing an application for suspension of deportation under the
1952 Act is a statutory requirement which cannot be waived administratively.

CHARGE:

Warrant: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Exclud-
able at time of entry—stowaway.

## BEFORE THE BOARD

**DISCUSSION:** Respondent is a native and citizen of Italy, 69
years of age, who claims to have entered the United States as a
stowaway in November 1922. He was found deportable by the
special inquiry officer and has been granted the privilege of voluntary
departure. The special inquiry officer denied respondent's applica-
tion for suspension of deportation on the ground that it was not filed
within the period provided by law. Respondent appeals from that
denial.

This is the fourth time this record has been before the Board. On
July 9, 1954, the Board stated that we would defer action on respond-
ent's appeal, and we remanded the case to the Immigration Service
for consideration of respondent's application to create a record of
lawful admission under the provisions of section 249(a) of the Im-
migration and Nationality Act. Respondent's application for reg-
istry was denied by the Service on August 9, 1955, on the grounds
that he failed to establish satisfactorily his continuous residence in
the United States prior to July 1, 1924, and that he failed to estab-
lish good moral character. He was again found to be deportable
under section 241(a)(1) of the Immigration and Nationality Act as

302

a member of a class of aliens excludable at the time of entry, to wit, a stowaway.

The case came before the Board again, and on December 4, 1956, we reopened the record in order that respondent might "apply for and prosecute an application for such discretionary relief as may be available to him under the Immigration and Nationality Act of 1952." This was a year before December 23, 1957, the date beyond which applications for suspension of deportation under section 244(a)(1) could not be made.

The next time the case came before the Board, it was here on a question of whether or not an application for suspension of deportation under that section had been timely made, and the Board again heard oral argument. Counsel contended that the Board adequately notified the Service that such an application was to be made, that a carbon copy of a Form I-256A had been delivered to an investigator for the Immigration and Naturalization Service during August 1957, which was well within the statutory period, and that this should be considered to constitute an application for suspension of deportation timely filed. There was lengthy argument on both sides at that time on this issue. The Board reopened the record again on November 12, 1958, for the purpose of developing fully "the circumstances under which the copy of the application for suspension of deportation was received by the Service, the time it was so received, and whether there was any dereliction on the part of the Service in not calling the attention of counsel or respondent to the fact that the application was unsigned and was not accompanied by a fee . . . Both the Government and the respondent should also be permitted to submit evidence on the merits of such application. At the reopened hearing it should also be ascertained whether respondent is deportable for two crimes involving moral turpitude after entry or on any other ground mentioned in section 244(a)(5) of the Immigration and Nationality Act."

The reopened hearing directed on November 12, 1958, was held on September 8, 1960. The special inquiry officer found on September 29, 1960, that the copy of the Form I-256A submitted to an investigator by counsel during August 1957 was not intended to be an application for suspension of deportation; that there was no dereliction on the part of the Service; and that only one of respondent's convictions in the United States was for a crime involving moral turpitude. He found that, since the respondent is not eligible for suspension of deportation, it was unnecessary to discuss the merits of the application and again granted respondent voluntary departure.

This case is before the Board on what is almost an agreed statement of facts with regard to the application for suspension. There

303

is no substantial difference between the facts presented by respondent and the findings of the special inquiry officer. The distinction is regarding the interpretation of the facts. Counsel contends (1) that the facts show a constructive application was timely filed, and (2) if there was no application, the fault lies in the Service not having held a hearing at which the application could be made formally following the remand of December 4, 1956, and prior to December 23, 1957.

There was no delay in the handling of this case prior to the Board's order of reopening on July 9, 1954. A period of two years then elapsed before the case was returned to the Board. A hearing was conducted on July 28, 1955, and an additional hearing on August 30, 1956. During this interval there was an appeal by counsel to the Regional Commissioner from the decision of the District Director on August 9, 1955, denying the application for adjustment under section 249.

Following the order of the Board remanding the case on December 4, 1956, counsel states in a letter of December 16, 1958, quoted in full in the special inquiry officer's decision, that during August 1957 Investigator E—T—P— advised counsel that the Service proposed to hold the reopened hearing in respondent's case in a matter of approximately 30 days. Investigator P— asked whether respondent would apply for discretionary relief, was advised that respondent would so apply and that the application had been prepared. The investigator stated it was necessary to conduct an investigation. Counsel for respondent continues, "He . . . asked if I would turn over to him *a copy of the application for suspension of deportation for his use* in obtaining information as to the past addresses and employment of Mr. A— [the respondent]. Accordingly the application was delivered to Mr. P— in person on August 23, 1957, in the Appraisers Building, San Francisco, California. At that time I offered to give him a number of supporting documents and he stated that they were unnecessary for his purposes. I also recall mention of the submission of photos with the application, but Mr. P— stated that there were a number of photographs in the file which had been submitted with the registry application and that photos were not necessary. At the time the suspension application was delivered to Mr. P—, it was my distinct impression that the Service proposed to hold further hearing in the very near future. From that date and until after the expiration of the provisions of section 244(a)(1) on December 23, 1957, this office *inadvertently overlooked* the submission of a fee for the filing of the suspension application" (emphasis supplied). Counsel's letter continues to describe the situation in his office which existed during the period immediately preceding December 23, 1957, when large numbers of applications for suspen-

304

sion of deportation were being prepared, particularly for persons of the Chinese race who voluntarily disclosed deportability to the Immigration Service as a result of the "Confession Program" instituted by the Service. Counsel continues, "In the haste and confusion attendant upon this last-minute preparation and submission of applications, the matter of submitting the fee in Mr. A—'s case was overlooked. This is a factual report of the circumstances as they occurred, and I believe they can be confirmed by a check with Mr. P—."

The affidavit from Investigator P— (reopened exh. 4), April 10, 1959, confirms counsel's statement, but is longer. He stated to counsel that in preparing the case of Mr. A— he would request an up-to-date neighborhood investigation, and declares, "I asked Mr. J— [counsel for respondent] to furnish me with *a list of the places of residence and employment* of Mr. A— for the preceding five-year period (emphasis supplied). At that time or within a very few days thereafter, Mr. J— handed me a copy of Form I-256A in question." The distinction here is that Investigator P— states that he requested only a list of the places of residence and employment of respondent for the preceding five-year period, and Mr. J— handed him the Form I-256A, not as an application for suspension of deportation but simply as a list of places of residence and employment. Mr. J—'s letter, on the other hand, states that Investigator P— asked him specifically for "a copy of the application for suspension of deportation for his use in obtaining information as to the past addresses and employment of Mr. A—."

The investigator continues, "I do recall that during the brief conversation with Mr. J— about the pending proceeding and investigation, Mr. J— told me that he did not think that the case would ever come to a hearing because Mr. A— was ill and he was thinking of returning voluntarily to Italy. I did not accept the copy of the Form I-256A, in question, with any understanding that it could possibly be a formal application for suspension of deportation . . . I did not have any discussion during 1957 with Mr. J— in regard to any statutory fee concerning the case of his client, Mr. A—." The record now contains a blue carbon copy of respondent's application, unsigned and undated, apparently the same copy as that given by counsel to Investigator P— in August 1957.

Investigator P— states that Mr. J— was aware of the policy of the Service with regard to accepting applications for suspension to be considered at a later date; that counsel submitted many such executed applications for his clients during the months October to December 1957; that if counsel had indicated to him that it was counsel's intention that the carbon copy of the form delivered during August 1957 was intended to constitute an application for suspen-

654377—63———21

sion, he would, of course, have informed counsel that the client's file did not contain a properly executed application, and that no fee was submitted with the Form I–256A.

Counsel argued orally and in his most competent brief: *First*, that prior to the expiration date for the filing of applications for suspension under section 244(a)(1), the Service policy was "relaxed" with regard to accepting applications for later consideration, notwithstanding the provisions of 8 CFR 242.16 which permitted the submission of a suspension application only during a hearing. He contends that if the Service could relax this provision, it could also relax the provisions regarding the time of paying a fee and submitting photographs and other documents in support of the application. He states that, knowing of the relaxed rule permitting applications for suspension to be filed prior to hearing, it was logical for counsel to assume that an application without a fee was also acceptable.

*Second*, counsel contends that neither he nor the alien is responsible for the long period of time which elapsed between the Board order of reopening in December 1956 and the reopened hearing in August 1958. During this interval the time for applying under section 244(a)(1) expired. He states that respondent did have a serious heart condition during that period, and that the condition continues unimproved. The record contains a letter from Dr. K— , Oroville, California, December 9, 1954, stating that respondent had been under his care since July 20, 1954, because of disease of coronary arteries and that it was necessary for him to limit his physical activities to a minimum and to avoid all forms of excitement. The record contains later letters and medical reports from Dr. D—C—, Oroville, California, addressed to the Immigration Service at San Francisco, on November 19, 1956, *April 16, 1957, May 14, 1958*, and August 30, 1960, stating that respondent had a coronary thrombosis requiring hospitalization for ten days during April 1956; that he has shown considerable improvement since his release from the hospital; that any exertion brings on anginal pain; that he is entirely disabled for heavy physical duty; that he must not become upset or agitated; that emotional upset might precipitate another attack; that another attack could occur at any time and could easily be fatal; that it would be unkind and inhuman to subject respondent to any unusual nervous or emotional stresses, *etc.* Dr. C— stated that throughout this period he was seeing respondent twice a week, giving him injections twice a week; that his disability is permanent in nature; and that he will require medical care for the rest of his life.

The Immigration Service states that it did not request respondent to come to San Francisco for a hearing until respondent had been examined by an officer of the United States Public Health Service,

who certified that respondent was able to appear at a hearing without danger to his health. The certificate from Dr. Norris, Medical Director, United States Public Health Service, dated May 27, 1958, finds respondent to be afflicted with arteriosclerotic heart disease, moderate. He states that two weeks' hospitalization would be unusually short if the doctor in charge of respondent's case considered the damage to the heart muscle to be of serious proportions. X-rays and electric cardiograms were ordered, and the results thereof appear in the certification. The certificate states, among other observations: "No evidence of cardiac decompensation was noted . . . Impression: probable arteriosclerotic heart disease. *E.K.G.*: slightly abnormal tracing but not diagnostic of myocardial disease." The certificate also states, parenthetically, "According to his statement he drove his own car from Oroville to San Francisco for this examination and expects to drive back home when this examination is completed." There is no exhibit number on this medical certificate, but it is in the record along with the letters from Dr. C—.

*Third*, counsel has cited a line of cases, including *Lee Hong v. Acheson*, 110 F. Supp. 60 (N.D. Cal., 1953); *In re Vacontios' Petition*, 155 F. Supp. 428 (S.D.N.Y., 1957); and *Application of Martini*, 184 F. Supp. 395 (S.D.N.Y., 1960), which held that when the alien is prevented from exercising a right granted him within a statutory period by unexplained or unnecessary administrative delay, or carelessness in handling his application, or in failing to inform him of his right, he will not be barred from asserting his rights or be deprived of the right. There are many such cases. *Lee Hong v. Acheson*, *supra*, and a similar case, *Lee Bang Hong v. Acheson*, 110 F. Supp. 48 (D.C. Hawaii, 1951), were matters concerning the preservation of United States citizenship. In *Lee Bang Hong v. Acheson*, *supra*, the alleged father commenced proceedings in 1941, when the plaintiff was seven years of age, and pursued his application diligently but unsuccessfully from 1948 until the boy became sixteen in 1950. In *Lee Hong v. Acheson*, *supra*, the plaintiff waited until within five months of his 16th birthday before applying for documents. The court held in both cases that the plaintiff had been prevented from the accomplishment of his purpose (arriving in the United States prior to attaining his 16th birthday) by failure of the American Consulate at Hong Kong to issue travel documents within sufficient time, and that the plaintiff had, therefore, "substantially complied with the requirements of the statute." In *Martini* the court stated (p. 401), "The dilemma in which petitioner finds himself is not of his own making."

The instant case does not fall within the rule of the above-cited line of decisions. Counsel states that his office "inadvertently overlooked the submission of a fee" and continues, "In numerous in-

stances, officers of the Service called our attention to cases in which suspension applications might properly be submitted" (letter of December 16, 1958). There was no obligation on the Service, however, to put counsel on notice of failure to file applications in all of the cases wherein his clients might be eligible to apply for suspension. Counsel describes the "hectic situation" in his office during the week preceding December 23, 1957. The alien was asked as long ago as March 22, 1954, at the close of his first hearing, whether he wished to apply for any relief from deportation, and counsel stated that his client did not wish to apply for any form of discretionary relief but had filed an application for adjustment under section 249 of the Immigration and Nationality Act. He was informed on August 9, 1955, and again on August 31, 1956, that his efforts to adjust his status through registry proceedings had been denied.

This case was not handled with any notable speed by the Service, but neither was there any move by counsel to bring the case to hearing. In his brief of October 20, 1960, counsel states, "No formal request for delay was made by respondent or counsel between December 1956 and August 1958," but the record contains five letters from the alien's doctors, submitted over the past seven years, with regard to his heart condition and the necessity of not subjecting him to emotional strain. The Service did not bring the case to hearing until respondent had undergone a thorough examination by the United States Public Health Service.

The nature of an application for suspension differs from the nature of the relief sought in the cases cited above. Both Vacontios and Martini had filed their petitions for naturalization under special provisions. Having filed the necessary forms, they could do nothing but wait. Even so, "Martini was not inactive," said the court, referring to efforts of Martini to ascertain his status. Because the Service failed to act promptly and within the statutory period, according to the court, the alien should not be found to have lost a right given him by law. The instant case does not fall within this rule. The Service did nothing here to lull the alien into false security. The failure to file the necessary application was purely a matter of oversight, and the fault does not lie with the Service.

The Board has held in at least five unreported cases that there is no authority for waiving the fee set by statute for an application for suspension of deportation. The Immigration Service has protested on other occasions the Board's citing unreported decisions, but in the instant case, the Service representative cited three of these cases, and offered copies of the decisions to counsel. *Matter of B—*, E–081272, unreported (B.I.A., July 21, 1953), concerned a special inquiry officer's refusal to entertain a petition for suspension

without payment of the $25 fee, on the ground that the regulations do not provide for processing such a petition without payment of the fee. Counsel contended that Congress did not intend that administrative officials should refuse to consider a petition for suspension when the party seeking relief could not meet the fee requirement. The Board stated, "We are unable to agree with the position of counsel. The fact is that the statute requires a fee of $25 in connection with applications for suspension of deportation, and no exception is indicated. Section 281(4), Chapter 9, Immigration and Nationality Act of 1952 (P.L. 414)." The appeal was dismissed. In *Matter of Z—*, A–5447395, unreported (B.I.A., March 29, 1956), the special inquiry officer held there was no valid application for suspension because no fee was paid, and the Board sustained the finding. *Matter of M—R—*, A–3696195, unreported (B.I.A., July 5, 1957), concerned the identical problem. Counsel relied on 8 CFR 6.16, providing that "a notice of appeal or motion *filed under this part* shall be accompanied by the fee prescribed in 8 CFR Part 2, but where the alien is unable to pay the fee, he may make an affidavit to that effect and request permission to prosecute the appeal or motion without prepayment of the fee." We pointed out that 8 CFR 6.16 was specifically limited to a notice of appeal or a motion filed under 8 CFR Part 6; that the motions to be filed under that part were motions for reopening or reconsideration; and that it *was those fees which may be waived and had been waived* in respondent's case insofar as they concerned his appeal in the deportation proceeding. We found that since the statute clearly requires the payment of the filing fee for an application for suspension of deportation in all cases, no valid application for suspension of deportation was before us. In *Matter of K—*, A–1840009, unreported (B.I.A., Oct. 23, 1958), the Board again held that section 281 of the Immigration and Nationality Act requires the payment of the fee of $25 for the filing of each application for suspension of deportation, and that there is and can be no regulatory authority for waiving it. We said, "The regulations concerned with motions and appeals have been made by an administrative agency which has seen fit to provide relief in the cases of indigent people, but the Congress has precluded the possibility of so doing in connection with applications such as those for suspension of deportation by providing in the law the requirement that a $25 fee be paid. This Act of Congress just cannot be disregarded."

Counsel points out that the Board and the Service have held in the past in many situations that one application for discretionary relief embraces another type of relief. For example, the Board has held that a denied application under the Displaced Persons Act of 1948, as amended, encompassed an application for suspension under

309

section 19(c) of the Immigration Act of 1917. Since respondent applied for registry under section 249 of the Immigration and Nationality Act on March 22, 1954, and renewed his application at a reopened hearing on August 30, 1956, counsel requests that those applications be held to embrace an application for suspension under section 244(a)(1) of the present Act. In *Matter of V—*, unreported, cited by the Service representative in oral argument, A-8057549 (B.I.A., April 18, 1957), the special inquiry officer made just this assumption, holding that respondent was deemed to have made an application under section 244(a)(1) in view of the fact that he had applied for adjustment of status under section 4 of the Displaced Persons Act of 1948, as amended. This Board, on appeal, stated, "A formal application and payment of fee are necessary. A section 4, Displaced Persons Act, application has been accepted as sufficient for an application for suspension under the 1917 Act, but cannot receive like recognition under section 244 of the Immigration and Nationality Act." We remanded the case to the special inquiry officer for the purpose of receiving a formal application for suspension. At that time section 244(a)(1) had not terminated.

We recognize that the above cases are all unreported cases. However, they demonstrate a firmly established administrative practice and, therefore, cannot be ignored. Oversight in the matter of selection of cases for publication may result from an assumption that a provision of law is so clear, or the administration of it so well-recognized, as not to need elucidation.

In oral argument the Service representative stated that since counsel for respondent had not argued the merits of respondent's application he also would limit his discussion to the issue of whether or not a valid application for suspension was made before the terminal date. However, in briefs and in the examining officer's memorandum on appeal there is discussion of the merits of respondent's application. The Board's order of November 12, 1958, also granted permission for the introduction of evidence on the merits. We have studied the entire record, including the testimony, exhibits, affidavits, letters of character witnesses testifying to respondent's good conduct and reputation, and briefs and representations of counsel in oral argument before the Service and the Board. We deem it proper to state that even though no application is before us the Board is of the opinion that if there were a valid application for suspension, there is not sufficient positive, favorable material in this record to justify commending respondent to Congress for a grant of suspension of deportation. The Board has given no weight or consideration whatever to the statement of Mr. T—C—, dated March 25, 1954. It contains conjecture and much extraneous material irrelevant to the present case. Mr. C— was not called as

a witness, and counsel was never given the opportunity to cross-examine him.

There is nothing in this long record to establish respondent's claimed entry date of 1922. In fact, respondent has made no effort to produce any evidence that he was in the United States until a considerably later date. He has never been candid with the investigators or the special inquiry officers in any of his hearings. He has denied his presence in several cities, even though Federal Bureau of Investigation and police arrest and fingerprint records show that he was present and was questioned at various times in those cities. Respondent has no family in the United States. He has a wife in Italy. He admits having lived in an extramarital relationship with one woman in San Francisco for a period of several years. Counsel refers to respondent as an "aged" man in poor health. The record establishes that he is 60 years of age, and that the United States Public Health Service has certified that he is able to travel. The record shows some assets in this country, and he claims to have sent money to his wife abroad. The investigator who executed reopened exhibit No. 4 on April 10, 1959, states that counsel informed him that respondent was thinking of returning voluntarily to Italy, and we cannot assign too much weight to the present argument that at his age and in his health respondent would be unable to support himself abroad. We have not discussed respondent's criminal record here and abroad, because it has received adequate attention in prior decisions by the Board and below. It is sufficient to state that as recently as December 1948 he was one of four defendants indicted by a grand jury and prosecuted for murder. He was not acquitted or convicted; the jury was dismissed, apparently for a mistrial, and the case was not retried.

Respondent has used several false names during the years he has lived in the United States and repeatedly has given contradictory evidence with regard to his use of false names. For a number of years he used a birth certificate which was either false or which belonged to someone else, claiming that he found it in the hall of his apartment house.

It is our conclusion that there was no "dereliction" on the part of the Service in not calling the attention of counsel or respondent to the fact that no valid application for suspension of deportation had been made in his case. The Service has mentioned repeatedly the fact that respondent is represented by a law firm thoroughly familiar with these matters. Absent this fact, the statute did not put the burden on the Service to examine its vast files and inform each alien of his rights under section 244(a)(1). The fact that officers of the Service did perform this courtesy voluntarily in many cases does not mean that failure to do so in any particular pending

311

case constituted a neglect of duty. The carbon copy of the application form found in this file was unsigned, undated, unaccompanied by the required fee, and the affidavits of the investigator and of counsel indicate that it was not intended by either of the persons concerned to constitute a final formal application for suspension. The fact that applications for suspension of deportation were accepted by the Service prior to December 23, 1957, for use at later deportation hearings did not constitute an automatic extension of the deadline set by the statute for the filing of such applications. The carbon copy of the Form I–256A turned over to Investigator P— did not constitute substantial compliance or measure up to the requirements of an application for suspension, even under such relaxed standards as prevailed during the final three weeks before December 23, 1957.

Balancing the favorable against the unfavorable aspects of this record, if there were a valid application here, the Board would be unable to find it meritorious, or to find that respondent's deportation would result in the exceptional and extremely unusual hardship to respondent demanded by section 244(a)(1) of the Immigration and Nationality Act.

**ORDER:** It is ordered that the order of the special inquiry officer of September 29, 1960, be and is hereby affirmed.

*It is further ordered* that the appeal be and is hereby dismissed.